UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION


NEOGENOMICS LABORATORIES, INC.,

        Plaintiff,

v.                                                          CASE NO.  2:17-cv-00054-JES-MRM

HEALTH DISCOVERY CORPORATION,

        Defendant.

_____

### AMENDED PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF PENDING COMPLETION OF ARBITRATION PROCESS

NeoGenomics Laboratories, Inc. ("NeoGenomics") sues Health Discovery Corporation ("Licensor") for declaratory relief finding that Licensor's attempt to terminate the license agreement was without immediate effect due to the parties' arbitration agreement, and for injunctive relief barring Licensor from selling or licensing intellectual property subject to the parties' license and arbitration agreement. In support, NeoGenomics states:

### Jurisdiction and Venue

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between corporate citizens of two different States.

2. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events giving rise to the claim occurred in this district.

### The Parties

3. NeoGenomics is a Florida corporation with its principal place of business at 12701 Commonwealth Drive, Suite 9, Fort Myers, Florida 33913. NeoGenomics is a premier cancer diagnostics and pharma services company serving oncologists, pathologists, pharmaceutical companies, academic centers, and others with innovative diagnostic, prognostic and predictive testing.

4. Licensor is a Georgia corporation with its principal place of business at 4243 Dunwoody Club Drive, Suite 202, Atlanta, Georgia 30350. It is a pattern recognition company that uses advanced mathematical techniques to analyze large amounts of data to uncover patterns that might otherwise be undetectable. It operates primarily in the field of molecular diagnostics where such tools are useful for scientific discovery.

### Factual Background

**A. The Parties Entered into an Intellectual Property  License Agreement**

5. On or about January 06, 2012, NeoGenomics and Licensor (together, "Parties") entered into an agreement ("License Agreement") whereby Licensor granted NeoGenomics and its affiliates an exclusive, worldwide license ("License") to use certain "Licensed Know-How" and "Licensed Patents" (together, "Licensed Technology") within the "Field" described in Article 1.6. A copy of the License Agreement is attached

hereto as **Exhibit A**. The parties agreed that Florida law applies to the interpretation of the License Agreement.

6.     Specifically, the License Agreement states in Article 2.1:

As of the Effective Date of this Agreement, Licensor hereby grants to Licensee and its Affiliates, and Licensee accepts the licenses under the Licensed Technology to exclusively use, develop, make, have made, sell, offer to sell, modify, import and otherwise commercially exploit the Licensed Uses and the Licensed Products in the Licensed Territory including, but not limited to, as follows:

(1)     an exclusive license for the use of the SVM Technology and the Licensed Patents in the Field in the Licensed Territory relating to Licensed Uses and Licensed Products; and

(2)     an exclusive license to the Licensed Know-How in the Field in the Licensed Territory, including access to and use of the Computer Software that has been developed by or for Licensor or will be developed by or for Licensor that may be applicable to Licensed Uses or Licensed Products; and

(3)     an exclusive license for the use of Licensed Products in the Licensed Territory.

7.     Pursuant to Article 4 of the License Agreement, the term of the License does not end until "the expiration of the last of the Licensed Patents licensed hereunder, unless earlier terminated pursuant to Article 8 hereof (the 'Term')." This is reiterated in Article 8.1 of the License Agreement, which states, "Except as otherwise provided herein, unless terminated earlier as hereinafter provided, and subject to the provisions of Article 8.3 of this Article, this Agreement shall terminate on upon [sic] the expiration of the last of the Licensed Patents licensed hereunder."

8.     To date, none of the Licensed Patents have expired, therefore the term of the License Agreement has not expired naturally and the License Agreement remains in effect.

9.     Relying on the License Agreement, its continued effectiveness, and Licensor's representations regarding same, NeoGenomics has expended millions of dollars using its best efforts to further the development and commercialization of the Licensed Technology, despite initial misrepresentations by Licensor regarding the state of the Licensed Technology.

**B.  The Parties Agreed, Under the License Agreement, to Procedures Governing Termination for Cause and Dispute Resolution**

10.    Under Article 8.3 of the License Agreement (the "Termination Procedure"), Licensor has the right to terminate the License Agreement for cause if NeoGenomics "fails to cure a material default within sixty (60) calendar days from receipt of written notice" to NeoGenomics from Licensor.

11.    In addition to protecting NeoGenomics with a sixty (60) day prior notice requirement, the Termination Procedure prohibits Licensor from terminating the License Agreement if NeoGenomics: (i) gives written notice of a dispute over the alleged material default or termination; and (ii) demands mediation or arbitration under the dispute resolution procedure set forth in Article 12 before the expiration of the sixty (60) day notice period.

12.    Article 12 of the License Agreement requires that the Parties follow a three-step arbitration procedure ("Arbitration Procedure") when a dispute arises between the Parties. In sum:

(i)     the Parties must first negotiate in person. Then if still in dispute;

(ii)    they must mediate, and if at an impasse after mediation;

(iii)   they must arbitrate.

13.    Under the Arbitration Procedure, after one of the Parties gives the other written notice of a dispute relating to the License Agreement, the Parties must "meet at a mutually acceptable time and place within thirty (30) days after the date of the notice to exchange relevant information and to attempt to resolve the dispute."

14.    If the Parties are unable to negotiate a resolution to the dispute within that thirty (30) day period, or one of the Parties refuses to meet within the required time period, either of the Parties can initiate mediation by sending the other a written request for mediation.

15.    If mediation does not lead to a resolution of the dispute within thirty (30) days of the request for mediation, the Parties must "resolve the dispute through binding arbitration."

**C.  Licensor Ignored the Required Termination Procedure, and Refused to Participate in the Required Arbitration Procedure Until After the Filing of the Initial Complaint in this Case**

16.    By a letter dated October 3, 2016 (the "Termination Letter"), Licensor attempted to wrongfully terminate the License Agreement. Inconsistent with Licensor's own past acknowledgments and admissions, Licensor claimed that NeoGenomics failed to use "its best efforts" to further develop and commercialize the Licensed Technology. Licensor also claims that NeoGenomics failed to provide certain reports and royalties timely. Not only was the attempted termination wrongful and based on false allegations,

Licensor refused to comply with the Termination Procedure, failed to give NeoGenomics the required sixty (60) day cure period, and claimed that the termination was effective immediately.

17.     NeoGenomics disputes all of Licensor's allegations of breach. NeoGenomics has not breached the License Agreement, and certainly exerted its best efforts to develop and commercialize the Licensed Technology.

18.     On October 4, 2016, NeoGenomics responded to the Termination Letter by: (i) giving Licensor written notice of a dispute in accordance with Article 12.1(1) of the Arbitration Procedure, and requesting that Licensor meet with NeoGenomics to negotiate a resolution; and (ii) requesting that Licensor retract the termination letter in compliance with the Termination Procedure. But Licensor refused those requests.

19.     On October 6, 2016, NeoGenomics then sent Licensor a written request for mediation in accordance with Article 12.1(2) of the Arbitration Procedure.

20.     In response to that letter, on October 7, 2016, Licensor notified NeoGenomics that it was delaying the effective date of the Termination Letter to allow both parties to negotiate their disputes. The parties then negotiated in person and otherwise, with the mediation request still in place.

21.     Specifically, on November 6, 2016, representatives of the Licensor met with representatives of NeoGenomics to discuss their disputes. That was followed on November 13, 2016, by Licensor's Acting CEO, Kevin Kowbel, sending NeoGenomics a proposed framework to renegotiate the License Agreement. On December 8, 2016, NeoGenomics sent a counter-proposal to Licensor. On December 19, Licensor, sent an

email to NeoGenomics, which among other things stated, "HDC is in the process of completing a thorough review of all aspects of the HDC/NEO relationship. Please also note that our review is slightly hindered by reasons we are not able to discuss due to confidentiality issues.  We will reply as quickly as possible."

22.    NeoGenomics did not receive further communications from Licensor relative to its December 8, 2016 counterproposal, until it received a letter from Licensor dated January 23, 2017 ("Termination Reassertion Letter") whereby Licensor repeated its claims of breach and stated that the termination of the License Agreement proclaimed in Licensor's Termination Letter was now "effective immediately."

23.    By so doing, Licensor again ignored NeoGenomics' invocation of the Termination Procedure and Arbitration Procedure, which bar termination of the License Agreement by Licensor prior to the conclusion of mediation and arbitration.

24.    Further, on January 26, 2017, Licensor filed a Form 8-K with the United States Securities and Exchange Commission whereby Licensor misinformed the SEC and the public that the Licensor's purported termination of License Agreement has immediate effect. Licensor stated:

> The MLA [Master License Agreement] provides for termination of the licenses by HDC upon a material breach by NeoGenomics and HDC is hereby exercising those rights. The Company believes, among other things, that NeoGenomics failed to use best efforts as defined in Section 2.3 of the MLA during the Development Term of the MLA. The termination by HDC does not trigger any early termination penalties for HDC.

> Accordingly, NeoGenomics has been directed to cease and desist all uses of the Licensed Products. Additionally, pursuant to the MLA, upon termination, NeoGenomics may not use any product or service based upon the Licensed Technology without infringing upon HDC's technology.

- 7 -

Furthermore, NeoGenomics has been notified that any patents, issued or pending, owned by either HDC or NeoGenomics which are based in whole or in part on HDC's patents or technology may not be used by NeoGenomics in the absence of a license authorized by HDC.

25.      Licensor did not inform the SEC or the public that NeoGenomics disputed the allegations of breach and invoked the Arbitration Procedure. Accordingly, Licensor failed to disclose to the SEC and the public that under the License Agreement, Licensor cannot terminate the License Agreement unless NeoGenomics agrees to a termination at mediation, or an arbitrator determines that NeoGenomics did indeed breach the License Agreement.

26.      NeoGenomics responded with a letter dated January 26, 2017 whereby it reaffirmed that it disputes Licensor's allegations and requested mediation. NeoGenomics also stated that because Licensor was refusing to mediate or arbitrate the parties' disputes, NeoGenomics would be seeking judicial relief.

27.      NeoGenomics then filed the initial complaint ("Initial Complaint") against Licensor in this case on January 27, 2017.

28.      Finally, on February 13, 2017, Licensor communicated its agreement to mediate, and if necessary, arbitrate the parties' disputes. However, Licensor still maintains that its termination of the licenses under the License Agreement had immediate effect. There is an immediate risk of irreparable harm to NeoGenomics arising from that position. Licensor has been attempting to re-license the Licensed Technology and is trying to exert ownership over NeoGenomics' intellectual property.

**D. Licensor Informed NeoGenomics that It Considers the License Terminated Immediately and It Intends to Market to Third Parties In China, Saudi Arabia, and other Foreign Countries**

29.     NeoGenomics paid $3 million in upfront consideration for the worldwide right to "exclusively use, develop, make, have made, sell, offer to sell, modify, import and otherwise commercially exploit" the Licensed Technology in the Field. The Licensed Technology included, among other things, the right to develop interpretative software and related technology for computer-aided analysis of flow cytometry tests, described in Article 1.12.5 of the License Agreement.

30.     In addition to the upfront consideration, NeoGenomics also spent millions of dollars further developing and improving the Licensed Technology, particularly the software and technology related to flow cytometry tests. This led to the creation of NeoGenomics' smart flow cytometry system ("Neo Smart Flow").

31.     Under Article 6.3.5 of the License Agreement, Licensor agreed that NeoGenomics would own Neo Smart Flow. Specifically, Licensor agreed that NeoGenomics would own all improvements to the Licensed Technology (i) made by or on behalf of NeoGenomics, or (ii) developed jointly by NeoGenomics and Licensor.

32.     During the Summer of 2016, NeoGenomics learned that Licensor was actively seeking to commercialize Neo Smart Flow in China, without NeoGenomics' consent and in violation of the exclusivity provisions of the License Agreement.  This was confirmed in writing by Licensor's Acting CEO, Kevin Kowbel, in an email to NeoGenomics on September 15, 2016, wherein he stated:

> It might end up going nowhere, but we have been invited back to China to talk about Flow Cytometry opportunities.  Our agents have spoken with 3

hospitals. We currently have interest from the PLA army hospital and have been lead to believe that President Xi and Premier Li could endorse a medical working together collaboration. The PLA hospital treats approximately 20 million upper class Chinese patient [sic] per year. The PLA has the ability to dictate standard of care processes and tests for all of China. Would a representative from Neo be interested in joining me in Beijing next month?

I did not expect this to materialize, but so far, touch wood, they are intrigued by the potential of our IP.

33.     Licensor then asked NeoGenomics to meet with Mr. Laurie Vanning, Dr. William Tao, and Nassar Al-Huraibi on October 25, 2016.  The purpose of this meeting was unclear to NeoGenomics prior to the meeting. But NeoGenomics agreed to meet with those individuals nonetheless, in order to be polite.  During this meeting, Mr. Vanning and Dr. Tao outlined that at the urging of Licensor, they had: (i) held a series of specific conversations with potential Chinese counterparts for the purpose of commercializing Neo Smart Flow in China, and (ii) advanced plans to sell or license Neo Smart Flow to certain hospitals connected with the People's Liberation Army ("PLA") in China, all of which had taken place without NeoGenomics' prior knowledge and despite the fact that the License Agreement makes it clear that NeoGenomics owns Neo Smart Flow.  Dr. Tao also expressed a desire to commercialize in China certain other technology developed by NeoGenomics related to prostate cancer testing.  In addition, Mr. Vanning and Mr. Al-Huraibi, outlined plans for marketing Neo Smart Flow in certain countries in the Middle East.

34.     During the parties' November and December 2016 negotiations, Licensor, through Mr. Kowbel, confirmed to NeoGenomics that Licensor wants to market Neo Smart Flow and certain Licensed Technology outside of the United States despite

NeoGenomics' ownership of the Neo Smart Flow and NeoGenomics' worldwide, exclusive license to the Licensed Technology.  In Licensor's November 13, 2016 email, Licensor confirmed that it is targeting China, Saudi Arabia, United Arab Emirates, Egypt, and Canada.

35.     Moreover, upon information and belief, NeoGenomics has reason to believe Licensor has discussed commercializing the Licensed Technology with certain of NeoGenomics' competitors in the United States, including OPKO Health, Inc.

36.     In short, Licensor is engaged in a campaign to license the Licensed Technology, and NeoGenomics' intellectual property, to third parties.

37.     Licensor's aggressive outreach to potential licensees demonstrates that Licensor's disclosure of NeoGenomics' intellectual property has either already occurred or is imminent.

38.     NeoGenomics attempted to negotiate an arrangement that would grant Licensor a grant back license to market Neo Smart Flow in China, Egypt, Saudi Arabia, and the United Arab Emirates, while still protecting NeoGenomics' broader rights, revenue, and intellectual property.

39.     But Licensor has rejected NeoGenomics' good-faith attempts to accommodate Licensor's wishes. Instead, Licensor has attempted to wrongfully terminate the License Agreement to steal back NeoGenomics' exclusive rights to the Licensed Technology and market the Neo Smart Flow system to other parties without the consent of NeoGenomics.

40.     If Licensor's wrongful immediate termination of the License Agreement, and attempts to re-license the Licensed Technology and license NeoGenomics' intellectual property (such as the Neo Smart Flow system) are permitted to stand, NeoGenomics will incur financial harm in excess of $75,000.00.

41.     All conditions precedent to the filing of this lawsuit have been met.

## COUNT I

### Declaratory Relief Finding that Licensor Cannot Terminate the License Agreement Prior to Completion of the Required Arbitration Procedure

42.     NeoGenomics incorporates paragraphs 1-41 as if set forth fully herein.

43.     Under Article 8.3 of the License Agreement, Licensor must give NeoGenomics notice of any alleged material default, and sixty (60) days to cure. Under that same article, Licensor cannot then terminate the License Agreement for a material default if NeoGenomics invokes the Arbitration Procedure under Article 12 to address the purported default. Specifically, Licensor agreed that it would not terminate the Agreement for material default before mediation or arbitration is concluded.

44.     Licensor did not allow NeoGenomics sixty (60) days to cure, and attempted to terminate the License Agreement with immediate effect through the Termination Letter. NeoGenomics timely denied the allegations of default, protested Licensor's failure to follow the Termination Procedure required under Article 8.3, and demanded that Licensor comply and participate in the Arbitration Procedure.

45.     After NeoGenomics filed its Initial Complaint in this case, Licensor finally agreed to mediate, and if necessary arbitrate, under Article 12.1(2).

46.     But an actual controversy remains between NeoGenomics and Licensor. Licensor still ignores the plain language of Article 8.3, and continues to maintain, as it reported to the SEC and the public, that the Termination Letter and Termination Reassertion Letter had immediate effect. They have acted accordingly in the marketplace.

47.     The controversy is therefore, did Licensor's Termination Letter and Termination Reassertion Letter terminate NeoGenomics' rights under the License Agreement immediately, or are they without any immediate effect on those rights due to Licensor's obligations under Article 8.3 and the pending Arbitration Procedure?

48.     To be clear, NeoGenomics is not asking the Court to decide whether NeoGenomics breached the License Agreement nor is NeoGenomics asking the Court to determine the merits of any of the underlying disputes. Those questions must be determined through the Arbitration Procedure. NeoGenomics simply seeks a declaration from this Court that pursuant to Article 8.3 of the License Agreement, the Termination Letter and Termination Reassertion Letter cannot have immediate effect. Under the License Agreement, Licensor can only terminate the License Agreement if a mediated settlement is not reached and an arbitrator determines NeoGenomics breached the License Agreement.

49.     Licensor's representations to the SEC and the public that Licensor's termination was effective immediately caused NeoGenomics injury and NeoGenomics is substantially likely to incur injury in the future due to this controversy and Licensor's representations.

50.     NeoGenomics will incur further injury when Licensor acts or continues to act in reliance upon the purported termination and re-licenses or discloses the Licensed Technology, and licenses or discloses NeoGenomics' intellectual property (including but not limited to the Neo Smart Flow system), to third parties in China, Saudi Arabia, United Arab Emirates, Egypt, Canada, or elsewhere.

51.     The Court is empowered under 28 U.S.C. 2201 to enter a declaratory judgment as to the parties' controversy over the legal effect of the Termination Letter and Termination Reassertion Letter.

### COUNT II
### Injunctive Relief to Bar Licensor from Re-licensing
### or Disclosing the Licensed Technology Pending Arbitration

52.     NeoGenomics incorporates paragraphs 1-41 as if set forth fully herein.

53.     Despite the plain language of Article 8.3 of the License Agreement, NeoGenomics' notice of dispute, and NeoGenomics' request for mediation under Article 12, Licensor is telling the world that: (a) the License Agreement has already been terminated; (b) NeoGenomics has no further rights under the License Agreement; and (c) NeoGenomics may no longer use Licensed Products.

54.     Licensor has done so with the intent of re-licensing the Licensed Technology and disclosing the underlying trade secrets and other intellectual property to parties in China, Saudi Arabia, United Arab Emirates, Egypt, Canada, and elsewhere.

55.     Worse, Licensor is also treating NeoGenomics' intellectual property as Licensor's own. Certain consultants, retained by NeoGenomics, were instrumental in further developing the source code ("Source Code") for Neo Smart Flow. The consultants

did so at the direction, and on behalf, of NeoGenomics, pursuant to agreements wherein the consultants agreed that their work on the Source Code was work for hire and NeoGenomics' property. Licensor used its leverage over those consultants to prevent them from turning over the Source Code to NeoGenomics, despite the plain language of the License Agreement regarding NeoGenomics' ownership of improvements to Licensed Technology. Licensor has since claimed that it owns the Source Code and Neo Smart Flow. It is obvious that Licensor intends on disclosing and licensing NeoGenomics' trade secrets and intellectual property, including the Source Code and Neo Smart Flow, to foreign third parties as well.

56.    If Licensor is permitted to re-license and disclose the Licensed Technology, and license and disclose Neo Smart Flow, such release of intellectual property, trade secrets and confidential information will cause NeoGenomics irreparable harm. Indeed, the harm that NeoGenomics will suffer would greatly exceed any harm that Licensor could suffer if the Court grants injunctive relief preventing such licensing and disclosures while parties' claims are resolved through the Arbitration Procedure.

57.    Furthermore, such actions by Licensor are and will also be disclosures of confidential information in violation of the confidentiality provision in Article 7 of the License Agreement ("Confidentiality Provision").

58.    Under Article 7.3, Licensor acknowledged that in the event of a breach or threatened breach of the Confidentiality Provision, NeoGenomics "may suffer irreparable injury for which damages at law may not be an adequate remedy." Accordingly, Licensor agreed that without prejudice to any other rights or remedies otherwise available to

NeoGenomics, NeoGenomics is entitled to seek equitable relief, including injunctive relief and specific performance, for any breach or threatened breach of the Confidentiality Provision by Licensor.

## **PRAYER FOR RELIEF**

For all the foregoing reasons, NeoGenomics requests the following relief:

(A)     declaratory relief declaring that pursuant to Article 8.3 of the License Agreement, the Termination Letter and Termination Reassertion Letter have no legal effect terminating the License Agreement, because under these circumstances, Licensor cannot terminate the License Agreement prior to completion of the Arbitration Procedure.

(B)     injunctive relief against Licensor barring them from re-licensing or disclosing the Licensed Technology, and licensing or disclosing Neo Smart Flow and the Source Code, to third parties in China, Saudi Arabia, United Arab Emirates, Egypt, or anywhere else unless the License Agreement is terminated through the Arbitration Procedure; and

(C)     any further relief the Court deems proper.

Dated:    February 16, 2017                    Respectfully submitted,


                                               */s/ William J. Simonitsch*
                                               William J. Simonitsch (Trial Counsel)
                                               Florida Bar 0422060
                                               **K&L GATES LLP**
                                               Southeast Financial Center – Suite 3900
                                               200 South Biscayne Boulevard
                                               Miami, Florida 33131-2399
                                               Telephone:  305.539.3300
                                               Facsimile:   305.358.7095
                                               E-mail:  bill.simonitsch@klgates.com

                                               *Attorneys for Plaintiff*
                                               NeoGenomics Laboratories, Inc.


                        <u>**CERTIFICATE OF SERVICE**</u>

        I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of

the Court by using the CM/ECF system. I also certify that the foregoing document is

being served this 16th day of February 2017 on all counsel of record via transmission of

Notices of Electronic Filing generated by CM/ECF.


                                               */s/ William J. Simonitsch*
                                               William J. Simonitsch